IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

ROBERT A. MORTON,                    )
                                     )
        Plaintiff,                   )
                                     )
v.                                   )        1:08cv942 (LMB/TRJ)
                                     )
SHEET METAL WORKERS' NATIONAL        )
PENSION FUND,                        )
                                     )
        Defendant.                   )

## MEMORANDUM OPINION

In this action brought under the Employee Retirement Income Security Act of 1974 ("ERISA"), plaintiff Robert Morton appeals the decision of the defendant, the Sheet Metal Workers' National Pension Fund, to suspend his pension payments based on its finding that he engaged in disqualifying employment while receiving his pension. The parties have submitted the issue for judgment on the basis of the administrative record. For the reasons that follow, the plaintiff's Motion for Judgment Pursuant to Fed. R. Civ. P. 52, or in the Alternative, for Summary Judgment Pursuant to Fed. R. Civ. P. 56 will be granted in part and denied in part, and the defendant's Motion for Summary Judgment will be granted in part and denied in part, and the case will be remanded to the defendant for further review.

## I.   Background

Plaintiff, Robert Morton, worked for over thirty-eight years in the sheet metal industry before officially retiring in 2004.

According to the administrative record,[1] Morton initially inquired about his pension rights with the Sheet Metal Workers' National Pension Fund ("Pension Fund"), on August 9, 1999. RM 13. On September 22, 1999, Morton was notified that he was vested and was credited with 34 years and 8 months of service, and 33 years and 7 months of Future Service.[2] RM 16-17. The notification letter also advised him about various retirement options under the Plan and his estimated benefits based on different retirement ages. Id.

Nearly five years later, Morton notified the Fund that he intended to retire in September of 2004.[3] By a letter dated September 20, 2004, the Pension Fund advised Morton that he had been credited with 38 years of pension credit between August 1965 and May 2003, of which 36 years and 11 months was future service

---

[1] References to the administrative record will be designated as "RM" in this Memorandum Opinion.

[2] For background purposes, future service credit is defined in the Plan as "the periods of his Covered Employment subsequent to the Contribution Date for which Pension Credit is granted to him in accordance with Article 4" of the Plan. See Plf.'s Ex. 2, § 1.19. A participant receives a certain number of future service credits a year based on the number of hours he works in covered employment during that year. Id. § 4.09. A participant will receive the maximum number of 12 months of future service credits per year if he works over a certain number of hours and will receive proportionately less credit for fewer hours worked in accordance with a schedule set out in the Plan. Id.

[3] Morton first indicated that he was applying for a pension effective September 1, 2004, but later changed his retirement date to September 29, 2004. RM 29-31, 35.

credit.  RM 36-37.  The letter also stated that certain
contributions from Morton's employer, Grove Accu-Fab Inc.,
between June and November 2003, were not considered in the
calculation of his pension because the company was delinquent in
its payments.  Id.  Based on this credit calculation, the Pension
Fund informed Morton that he was entitled to receive Special
Early Retirement Benefits, but that he did not qualify for the
55/30 Pension.[4]  Id.  The letter also alerted Morton to his
appeal rights under the Plan.  Id.

Morton apparently did not respond to the September 20, 2004
letter, and on November 1, 2004, the Pension Fund wrote Morton
again.  RM 67.  In this letter, the Pension Fund informed Morton
that it had not yet received the retirement forms that they sent
to him on September 23, 2004.  Id.  The letter asked Morton to
advise the Pension Fund if he did not intend to retire or if he
needed new forms.  Id.  The letter also stated that Morton's file
would be deactivated if he did not respond within six months.
Id.  On January 31, 2005, the Pension Fund again notified Morton
that it had not received the forms and that his file would be

---

[4] These qualifying issues are not directly relevant to the
present dispute, but because both parties discuss them, they will
be addressed briefly.  In its motion for summary judgment, the
Pension Fund explains that a 55/30 pension "is an early
retirement pension that is unreduced on account of age for
participants who, among other things, have attained the age of 55
and have 30 years of creditable service for work in covered
employment."  Def.'s Mem. of Law in Supp. of Mot. for Summ. J. 3
n.2.

3

deactivated if he did not return the forms. RM 68. Morton was notified that his file had been deactivated on April 8, 2005. RM 69.

On May 3, 2005, Morton, through counsel, wrote the Pension Fund regarding his eligibility for the 55/30 Pension. RM 70-71. In this letter, Morton's counsel stated that the denial of the 55/30 Pension was improper because the Fund had taken action against Grove Accu-Fab and received payment covering the delinquency on October 19, 2004. RM 70. Counsel asked that Morton receive credit for the payments from June through November of 2003, and that the Pension Fund reconsider its decision denying the 55/30 Pension. Id. On May 10, 2005, the Pension Fund wrote Morton's attorney to notify him that, after considering the information provided by the attorney, Morton qualified for the 55/30 Pension, as long as he retired by December 2005 or earlier and was not working in Disqualifying Employment. RM 73. By a letter dated May 23, 2005, Morton advised the Pension Fund that he had retired as of September 24, 2004 and that he wished to reactivate his file. RM 75. On June 2, 2005, the Pension Fund notified Morton that he was entitled to benefits beginning on June 1, 2005. RM 76. Morton then elected to receive a 55/30 Level Income Pension that would pay him $3,502.00 per month until he turned 62 years old, and $2,156.00 after he turned 62. RM 84.

In the process of activating his pension, Morton received a

4

number of warnings about engaging in employment while he was
receiving the pension.  One document among the enrollment forms,
entitled "Pension Detail," advised that "Plan Rules allow for
limited work in Covered Employment after retirement (refer to the
enclosed Summary of Disqualifying Employment for more details)."
RM 85, 105.  On another form, entitled "Retirement Declaration
and Acknowledgment," Morton was required to certify that his last
date of employment in the Sheet Metal Industry was September 30,
2004 and that he had "not worked in any Disqualifying Employment,
as defined in Plan Rules, after the effective date of my
pension."  RM 87.  Morton also agreed to notify the Fund in
writing "within 21 days of starting any work of any type that is,
or may be, Disqualifying Employment."  Id. (emphasis in
original).  Morton signed this Form on June 29, 2005.  Id.  In
July, Morton received a letter that congratulated him on his
retirement and included his first pension check.  RM 82.  This
letter also informed Morton that he had certain responsibilities
to the Pension Fund.  Specifically, the letter advised Morton
that he "must contact the Fund Office in writing in the event"
that he "return[ed] to Disqualifying Employment."  Id. (emphasis
in original).  The record does not reflect that Morton ever
provided such notice to the Pension Fund.

Morton received his pension without incident for the next
two years.  During that time, however, he began working for
Champion Environmental Services, Inc. ("Champion"), a company

that provided asbestos abatement services.  On August 27, 2007,
he received a letter from the Pension Fund requesting that he
sign a Social Security release in order for the Fund to confirm
that he was still eligible for pension payments.  RM 120.  Morton
signed the release on September 13, 2007.  RM 124.  By a letter
dated October 16, 2007, Morton was notified that his December
2007 pension payment was being suspended because his employment
with Champion constituted disqualifying employment under Section
8.06 of the Plan.  RM 121-23.  Specifically, the Pension Fund
found that because the abatement services work done by Champion
was also being done by contributing employers, it was
disqualifying employment under § 8.06(d)(1)(B).  Id.  The Pension
Fund also found that Morton's work for Champion constituted work
in the sheet metal industry because it was work under the trade
jurisdiction of the Union under the SMWIA's Constitution, Art. 1,
§ (bb).  Id.  Accordingly, it was disqualifying employment under
§ 8.06(d)(1)(E).  Id.  Lastly, the Fund determined that Champion
had not signed a collective bargaining agreement with the Union.
Id.  Based on these determinations, the Fund notified Morton that
he was required to reimburse the Fund for all of the retirement
payments he received while working for Champion and that once he
stopped working, he would be subject to additional suspension
under §§ 8.06(a)(2 & 3).  Id.  The letter notified Morton that
the Fund would assume that he continued to work in disqualifying
employment until they were notified otherwise, in writing, and

6

ended by informing Morton of his appeal rights.  Id. (emphasis in original).

On April 3, 2008, Morton, through counsel, gave notice to the Fund that he was appealing its decision to suspend his pension benefits because of his employment with Champion.  RM 170.  The letter also stated that "Mr. Morton is not employed by Champion Environmental Services, Inc. and is fully eligible for his pension."  Id.  Morton's counsel asked for documents related to the decision, including "the SPD or Plan documents, the internal Dialogue concerning this decision and all copies of relevant materials including internal memos, surveillance materials or reports and all materials used or usually used in making this decision."  Id. (capitalization of dialogue in orginial).

After being notified that the Appeals Committee was meeting in late June, Morton's counsel filed his formal notice of appeal on June 12, 2008.  RM 160-61.  The appeal letter repeated that Morton was no longer employed by Champion and was eligible for his pension and also made substantive objections to the suspension.  Id.  First, Morton argued that his work at Champion did not involve work in a related building trade as defined by the Plan.  Id.  Specifically, he argued that he was working in the demolition and recycling industry, which was not related to the sheet metal industry.  Id.  In support of this argument, Morton relied on the list of union products on the union website,

7

which did not include demolition and recycling, and a description of "sheet metal workers" in a study published in the Jobs Rated Almanac.  Id.  Morton also enclosed a copy of the website of the Sheet Metal and Air Conditioning Contractors' National Association, arguing that it established that the sheet metal industry had no relation to the demolition industry.  Id.

Second, Morton argued that the tasks he completed as an employee for Champion were not related to the sheet metal industry.  RM 161.  These tasks included delivering parts to job sites and changing motors and hydraulic lines on equipment and machines.  Id.  Morton argued that this work could not be considered sheet metal work.  Id.  Finally, Morton argued that the contributing employer to which the Fund was comparing Champion was geographically distant from Morton and Champion and was only tangentially related to the industry because a union company merely owned a subsidiary asbestos removal company that performed the same services as Champion.  Id.  Morton asked the Appeals Committee to reverse the earlier decision on these grounds.  Id.

On June 26, 2008, the Appeals Committee of the Pension Fund met and considered Morton's appeal.  By a letter dated July 1, 2008, the Appeals Committee informed Morton's counsel that the committee had denied Morton's appeal of his suspension, finding that suspension was appropriate under both § 8.06(d)(1)(B) and § 8.06(d)(1)(E).  RM 146-48.  As to the first ground for

8

suspension, "employment with any employer in the same or related business as any Contributing Employer" under § 8.06(d)(1)(B), the Committee rejected Morton's argument that it was improper to consider a Kansas company in deciding that Champion's work was done by other contributing employers.  Id.  The Committee found that the text of § 8.06(d)(1) did not contain a geographical limitation and that because the Pension Fund is a national fund, it was reasonable and fair to consider employers across the country.  Id.

The Appeals Committee also considered the basis for suspension under § 8.06(d)(1)(E) for "employment in the Sheet Metal Industry that is not covered by a Collective Bargaining Agreement between the Union and the employer."  The Committee considered information from Champion's website, which stated that the company's business primarily involved asbestos abatement. Id.  The Appeals Committee concluded that this work constituted sheet metal work as defined in the Plan because:

> 1) asbestos abatement is also performed by the
> International Association of Heat and Frost Insulators
> and Allied Workers, which is a related building trade,
> as evidenced by their affiliation with the Building &
> Construction Trades Department, of the AFL-CIO;
> 2) Article 1, § 5(bb) of the SMWIA Constitution claims
> jurisdiction over this work . . . and sheet metal
> workers and insulators are often found on the same job
> sites; and,
> 3) for many years, the SMWIA had a collective
> bargaining form targeted at asbestos abatement.

RM 146-48.  The Appeals Committee also addressed Morton's argument that the tasks he performed at Champion did not merit a

suspension, but found that Morton's tasks, described as changing hydraulic lines and rebuilding equipment, were also covered by the SMWIA Constitution. Id. Based on these findings, the Appeals Committee concluded that Morton's work was disqualifying employment pursuant to §§ 8.06(d)(1)(B) and 8.06(d)(1)(E) of the Plan, and he was subject to a suspension under §§ 8.06(a)(1) and 8.06(a)(3). Id. Morton was notified of his right to file a lawsuit under ERISA for review of the Appeals Committee decision. Id. On September 11, 2008, Morton timely filed for judicial review of that decision, seeking a judgment declaring that the Pension Fund must provide benefits under the Plan, back pay and pre-judgment interest from the denial date of December 1, 2007, reasonable attorneys' fees, and costs. Both parties have moved for judgment on the basis of the administrative record.

## II. Discussion

### A. Standard of Review[5]

When reviewing a denial of benefits under an ERISA plan, the Court must first determine whether the plan documents give the

---

[5] This matter comes before the Court on plaintiff's Motion for Judgment Pursuant to Fed. R. Civ. P. 52, or in the Alternative, for Summary Judgment Pursuant to Fed. R. Civ. P. 56 and the defendant's Motion for Summary Judgment Pursuant to Fed. R. Civ. P. 56. In the Fourth Circuit, district courts generally decide ERISA claims on motions for summary judgment under Fed. R. Civ. P. 56, and the Court will resolve these motions under the familiar summary judgment standard. Summary judgment is appropriate if the pleadings and evidence submitted by the parties "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56.

plan administrator the discretion to make a benefits-eligibility determination.  Woods v. Prudential Ins. Co. of Am., 528 F.3d 320, 321-22 (4th Cir. 2008).  A plan may confer discretion by either including "language which expressly creates discretionary authority" or "terms which create discretion by implication."  Id. (quoting Feder v. Paul Revere Life Ins. Co., 228 F.3d 518, 522-23 (4th Cir. 2000)).  If the plan gives the administrator discretion, the Court reviews the plan administrator's decision under the deferential abuse of discretion standard.  Id.  Otherwise, the decision is reviewed de novo.  Id.

Here, because the parties agree that the language of the Plan granted discretion to the administrator to interpret provisions of the Plan and determine eligibility for benefits, the Court will review the decision for abuse of discretion.  See Woods, 528 F.3d at 321-22.  Under the abuse of discretion standard, a decision will not be disturbed if it is reasonable. A decision is reasonable if it "is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence."  See Brogan v. Holland, 105 F.3d 158, 161 (4th Cir. 1997) (citations omitted).  Substantial evidence is more than a scintilla, but less than a preponderance of the evidence.  Newport News Shipbuilding and Dry Dock Co. v. Cherry, 326 F.3d 449, 452 (4th Cir. 2003).

   B.   Motions for Summary Judgment

Morton argues that the evidence establishes that the Pension

11

Fund[6] acted unreasonably, arbitrarily, capriciously, and in bad
faith because the Pension Fund did not provide the necessary
materials to him and because the determination was wrong and
against the weight of the record.   Morton asks the Court to
reverse, not remand, the decision of the Pension Fund.

The Pension Fund asks the Court to find that the Appeals
Committee did not abuse its discretion in deciding that Morton's
employment with Champion constituted disqualifying employment
under the Plan.

### 1.   Suspension under Section 8.06(d)(1)(E)

Morton first argues that the Pension Fund failed to provide
him with materials necessary to perfect his appeal, focusing
mainly on the Pension Fund's failure to provide him with a copy
of the SMWIA Constitution.   In referring to the Constitution
during its meeting and in its letter denying Morton's appeal and
affirming the suspension of benefits, the Appeals Committee made
the Constitution relevant to its conclusion that Morton had
worked in the sheet metal industry, and, thus, was engaged in
disqualifying employment under § 8.06(d)(1)(E) ("employment in
the Sheet Metal Industry that is not covered by a Collective
Bargaining Agreement between the Union and the employer").   As
Morton points out, the SMWIA Constitution does not appear in the
administrative record.

------

[6] Morton repeatedly states that the "Union" acted
unreasonably, but only the actions of the Pension Fund are at
issue in this civil action.

The Pension Fund concedes that the SMWIA Constitution does not appear in the administrative record and appears to concede that the Court may not now rely on it in determining whether its decision was arbitrary or capricious. See Def.'s Mem. of Law in Opp'n 6.

The Appeals Committee also based its decision to suspend Morton's benefits under § 8.06(d)(1)(E) on two other findings that are not supported by evidence in the administrative record. First, the Committee found that Morton's employment with Champion constituted work in a related building trade because asbestos abatement was also performed by the International Association of Heat and Frost Insulators and Allied Workers which is affiliated with the Building & Construction Trades Department of the AFL-CIO. The Committee also found that the SMWIA had a collective bargaining agreement targeted at asbestos abatement for several years. However, no information about the International Association of Heat and Frost Insulators and Allied Workers and its affiliation with the AFL-CIO or the SMWIA's collective bargaining agreement that targeted asbestos abatement appears in the administrative record.

Evidence that was not presented to the Appeals Committee and which is not included in the administrative record will not be considered in determining whether the decision to suspend benefits was supported by substantial evidence. See, e.g., Bernstein v. CapitalCare, Inc., 70 F.3d 783, 790 (4th Cir. 1995).

13

Because the Appeals Committee based its finding that Morton engaged in disqualifying employment under § 8.06(d)(1)(E) by referring to the SMWIA Constitution, the International Association of Heat and Frost Insulators and Allied Workers' affiliation with the Building & Construction Trades Department of the AFL-CIO, and a SMWIA collective bargaining agreement that was targeted at asbestos abatement, none of which are in the record, the decision denying benefits under § 8.06(d)(1)(E) was not supported by substantial evidence. Accordingly, the Appeals Committee abused its discretion, and its decision will therefore be reversed.[7]

In response to Morton's arguments, the Pension Fund points out that the decision to deny benefits was based on two independent provisions of § 8.06(d)(1). Accordingly, the Pension Fund argues that even if the Court does not find that the decision relying on § 8.06(d)(1)(E) is supported by substantial evidence in the absence of the Constitution, the decision to suspend Morton under § 8.06(1)(d)(B) is supported by substantial evidence.

### 2. Suspension under Section 8.06(d)(1)(B)

Morton attacks the decision to suspend benefits under § 8.06(d)(1)(B), arguing that the evidence in the record does not

---

[7] This decision cures Morton's argument that he was denied a full and fair review of his claim because the Pension Fund failed to provide him with all of the materials that supported that the decision to suspend benefits under § 8.06(d)(1)(E).

support a finding that Performance Abatement Services ("PAS"),
the Kansas company to which Champion was compared, was a
Contributing Employer as defined by the Plan.[8]  Specifically,
Morton argues that the evidence of PAS's remittance does not
establish that PAS was obligated under a Collective Bargaining
Agreement and that the computer printout shows that PAS was not
making payments during parts of 2005 and 2006.  The Pension Fund
responds that an employer would not contribute to the Fund unless
it was required to by a collective bargaining agreement and that
this printout supports a finding that PAS was a Contributing
Employer.  The Fund also contends that the lapse of payments does
not support a finding that PAS had ceased to be a Contributing
Employer, as that term is defined by the Plan.

    The Court finds that the Appeals Committee's decision to
suspend Morton under § 8.06(d)(1)(B) is adequately supported by
evidence in the record.  First, the parties do not dispute that
Champion performed abatement services.  See also RM 127-131.
Second, the evidence in the record supports the Appeals
Committee's finding that PAS engaged in lead and asbestos
abatement and was making payments to the Pension Fund.  RM 132-

_____

    [8] Section 1.10(a) of the Plan defines a "contributing
employer" as an employer who: 1) has a Collective Bargaining
Agreement with the Union requiring periodic contributions to the
Fund created by the Trust Agreement; 2) participates in the Plan
in accordance with the provisions of Article 2 hereof, and such
other conditions or requirements as the Trustees may impose; and
3) whose status as a Contributing Employer has not been
terminated by the Trustees for failing to comply with its
participation obligations.  Plf.'s Ex. 2.

134.   Lastly, the evidence that PAS was making payments to the
Pension Fund is strong circumstantial evidence that it was bound
by a collective bargaining agreement that required contributions.
These facts provide more than a scintilla of evidence upon which
to conclude that Morton was working with an employer which was
"in the same or related business as any Contributing Employer"
under § 8.06(d)(1)(B).

    On this record, it was neither arbitrary nor capricious for
the Appeals Committee to conclude that § 8.06(d)(1)(B) contained
no geographical limitation.  Section 8.06(d)(1)(B) defines
disqualifying employment as "employment with any employer in the
same or related business as any Contributing Employer," and the
plain language of the Plan does not include any geographic
limitation in determining whether employment in the same or
related business is disqualifying.  Moreover, the Pension Fund's
national scope supports finding no geographical limitation.  As
the Pension Fund correctly argues, to interpret the section
otherwise would allow some pensioners, and not others, to work in
the same or related businesses depending on where they lived and
the proximity of a contributing employer.  Accordingly, the
Appeals Committee's interpretation will be affirmed.

    3.   **Suspension of Benefits Under Sections 8.06(a)(1) and
         8.06(a)(3)**

    Although the Court finds that the decision to suspend Morton
under § 8.06(d)(1)(B) was supported by substantial evidence, the

conclusion that the decision to suspend under § 8.06(d)(1)(E) was not supported by substantial evidence affects the amount of benefits the Pension Fund may suspend.  Because it determined that Morton had participated in disqualifying employment under both §§ 8.06(d)(1)(B) and 8.06(d)(1)(E), the Appeals Committee found that Morton was subject to suspension of his pension benefits as set forth in §§ 8.06(a)(1) and 8.06(a)(3).  RM 146-48, 204.  The suspension of benefits under § 8.06(a)(1) is not affected by the Court's decision.  However, the suspension under Section 8.06(a)(3) is implicated.  That section states:

> In addition to any period provided in Section 8.06(a)(1) and (2), the monthly benefit shall be suspended for 6 consecutive months for every calendar quarter in which the Pensioner was <u>engaged in Disqualifying Employment of the type described in Section 8.06(d)(1)(E)</u>.

Plf.'s Ex. 2 (emphasis added).  Because the Court has found that the decision to suspend benefits under § 8.06(d)(1)(E) was not based on substantial evidence, the application of § 8.06(a)(3) is not supported by substantial evidence, and the decision to suspend benefits under this provision is reversed.

### C.    Whether the Department of Labor Regulations Protect Morton

Morton's final argument is that Department of Labor regulations prevent the Pension Fund from suspending his benefits under these circumstances.  Specifically, Morton relies on 29 U.S.C. § 1053(a)(3)(B)(ii) and 29 C.F.R. § 2530.203-3, which Morton contends prohibits the Pension Fund from suspending his

benefit payments unless it shows Morton was re-employed in the same industry, same trade or craft, and the same geographic area. Morton also argues that the Pension Fund is required to resume paying benefits to him because the regulations limit the length of the suspension and the percentage of benefits that may be suspended.[9]  Morton failed to raise these arguments before the Appeals Committee in his June 12, 2008 appeal, and, thus, no evidence as to whether these regulations apply to Morton appears in the administrative record.

The regulation at issue, 29 C.F.R. § 2530.203-3(a), states in relevant part:

> A plan may provide for the suspension of benefits which commence prior to the attainment of normal retirement age . . . for any reemployment and without regard to the provisions of section 203(a)(3)(B) and this regulation to the extent (but only to the extent) that suspension of such benefits does not affect a retiree's entitlement to normal retirement benefits payable after attainment of normal retirement age, or the actuarial equivalent thereof.

Based on this provision of the regulation, the Pension Fund argues that the regulations do not apply to Morton because he has not yet reached normal retirement age and because the suspension "does not affect his entitlement to his normal retirement benefit at Normal Retirement Age (i.e., age 65)."  Def.'s Mem. of Law in Opp'n 15.

Morton responds that the regulations do apply because of the

---

[9] The October 16, 2007 suspension letter advised Morton that the Fund intended to suspend his benefits under § 8.06 of the Plan and cited to the regulation now at issue.  See RM 120-21.

particular pension option he chose.  The 55/30 pension provided Morton with a higher monthly payment of $3,502.00 until he was 62, and then a lower monthly payment of $2,156.00 thereafter.  RM 84.  Had he not chosen this option and simply waited until reaching the normal retirement age of 65 to receive his pension, the monthly payment would have been $2,872.00.  Morton argues that the suspension affects the actuarial value of his benefits because he has lost the benefit of the higher monthly payment of $3,502.00 pension during the suspension and will receive only $2,156.00 per month after he reaches age 62.

Morton did not explicitly make this argument about the actuarial value of his pension until he filed his Reply to Defendant's Motion for Summary Judgment, and the Pension Fund did not have the opportunity to directly respond to this argument in its briefs, although it was summarily addressed at oral argument, with defense counsel asserting that Morton will in fact receive the actuarial equivalent of the normal retirement benefits he was entitled to receive after attainment of normal retirement age, even though he did not receive all of the payments he expected to receive before reaching age 65.  However, there is no evidence in this record as to what the actuarial equivalent is or how it was calculated.  Thus, the Court cannot determine whether the Department of Labor regulations are violated by the decision of the Pension Fund.

## III. Conclusion

For these reasons, the decision of the Pension Fund will be affirmed as to its conclusion under § 8.06(d)(1)(B), reversed as to its conclusion under § 8.06(d)(1)(E), and remanded to allow for recalculation of the pension benefit to which Morton remains entitled, taking into consideration that the Court only affirmed the denial of benefits based on § 8.06(d)(1)(B) of the Plan. Upon remand, the Pension Fund must address whether the suspension of benefits under § 8.06(d)(1)(B) affects Morton's entitlement to "normal retirement benefits payable after attainment of normal retirement age, or the actuarial equivalent thereof."

Accordingly, the parties's motions for summary judgment will be granted in part and denied in part, by an Order to be issued with this Memorandum Opinion.

Entered this 23rd day of June, 2009.

Alexandria, Virginia

/s/

Leonie M. Brinkema
United States District Judge